2006-NMSC-046

143 P.3d 717

**Roddie CHAVARRIA and Norma Castaneda, Plaintiffs–Petitioners,**

v.

**FLEETWOOD RETAIL CORPORATION of New Mexico, Defendant–Respondent.**

**No. 29,246.**

Supreme Court of New Mexico.

Sept. 6, 2006.

As Revised Oct. 11, 2006.

Kyle W. Gesswein, Las Cruces, NM, Janet K. Santillanes, Olivia Neidhardt, Feferman & Warren, Richard N. Feferman, Albuquerque, NM, for Petitioners.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Edward Ricco, Jeffrey M. Croasdell, Albuquerque, NM, for Respondent.

## OPINION

CHÁVEZ, Justice.

{1} In this case, it is undisputed that employees of Fleetwood Mobile Homes committed fraud during the sale of a mobile home to Roddie Chavarria and Norma Castaneda (Plaintiffs). It is also undisputed on appeal that Fleetwood failed to deliver the customized mobile home it promised and set up the home it did deliver in an unworkmanlike manner. The district court judge, sitting without a jury, found in favor of Plaintiffs and awarded compensatory and punitive damages plus attorney fees. On appeal, the Court of Appeals reversed a portion of the compensatory damages award, concluding that certain elements of damages were duplicated, and reversed the punitive damages award, concluding that Fleetwood was not liable for the fraudulent conduct of its employees. *Chavarria v. Fleetwood Retail Corp.*, 2005–NMCA–082, 137 N.M. 783, 115 P.3d 799. We granted certiorari and reverse the Court of Appeals regarding the compensatory and punitive damages claims. We affirm that portion of the Court of Appeals' opinion reinstating Defendant's counterclaim.

## I. FACTS

{2} Plaintiffs lived in a 1,120–square–foot trailer with their four children in Las Cruces. Mr. Chavarria, who attended school up to the 9th grade, worked as a custodian at New

Mexico State University, and Ms. Castaneda worked as a presser at Alameda Laundry and Cleaners. Plaintiffs noticed a marquee at Fleetwood advertising no payments for ninety days. Plaintiffs found the ninety-day grace period attractive because it would allow them to pay off other debts, which in turn would enable them to purchase a new mobile home with a higher monthly mortgage payment. When Plaintiffs went to Fleetwood to investigate the purchase of a mobile home, sales agent Devon Pike assured Plaintiffs that the ninety-day grace period would apply to them. Bob Lancaster, the general manager of the Fleetwood office in Las Cruces assisted Pike in selling a mobile home to Plaintiffs.

{3} Plaintiffs selected a 1,568–square–foot, four-bedroom home so that their two teenage sons would not have to share a room. Fleetwood submitted Plaintiffs' credit application to GreenPoint Credit, and GreenPoint approved the financing for the four-bedroom home. Pike called Plaintiffs and informed them that they had been approved to purchase the four-bedroom home. A few days later, however, Pike called Plaintiffs to tell them "that the bank had gone back on the four-bedroom deal" and urged them to try and qualify for a less expensive, three-bedroom home. After Plaintiffs had settled on a three-bedroom home, Pike told Plaintiffs that GreenPoint had changed its mind and was once again willing to approve them for the four-bedroom home. Plaintiffs selected a four-bedroom home and thought it was set for delivery. Yet, about one week later, Pike made a fourth call to Plaintiffs, informing them that GreenPoint had once again changed its mind and decided to reject Plaintiffs' financing application for the four-bedroom home. In truth, GreenPoint never denied Plaintiffs' loan application for a four-bedroom home.

{4} Plaintiffs ultimately agreed to purchase a 1,232–square–foot, three-bedroom home, paying virtually the same amount for it that they would have paid for the four-bedroom home they previously selected. Plaintiffs ordered the home without double sinks or a garden tub in the master bathroom and without a new dishwasher or refrigerator, features Plaintiffs did not deem necessary. In addition, Plaintiffs requested three custom features: bigger closets in the kids' rooms, commercial-grade carpet throughout the trailer, and a window in the master bathroom. Pike assured Plaintiffs they would receive a "custom ordered trailer."

{5} Unbeknownst to Plaintiffs, Pike and Lancaster falsified Plaintiffs' income to GreenPoint, altering their credit applications to show that Ms. Castaneda earned an additional eight hundred dollars a month from a side job at another dry cleaning business. Pike and Lancaster set up a fake, or "dummy," telephone number so that GreenPoint could call and "verify" the false income, and fabricated a pay stub from Ms. Castaneda's fictitious employer. In addition, Pike and Lancaster forged Plaintiffs' signatures on credit and loan application documents.

{6} Pike and Lancaster agreed to let Plaintiffs use their old trailer as a trade-in to satisfy GreenPoint's ten percent down payment requirement on the deal, and assigned it a retail NADA value of $11,349. GreenPoint relied on this value "as an accurate evaluation of collateral." After deducting what Plaintiffs still owed on the trailer, Fleetwood gave Plaintiffs a cash value of $8,409.20 to use as a down payment on their new home. Pike and Lancaster also certified to GreenPoint that they were building a garage and decks on Plaintiffs' property costing $7,500 and $2,000, respectively. Plaintiffs were assured they would not be charged extra for the garage and decks. Yet, Pike and Lancaster submitted fictitious invoices to GreenPoint showing that the garage and decks had been installed, and GreenPoint released $9,500 of Plaintiffs' money to Fleetwood. Once GreenPoint became aware that the garage and decks had not been installed, they directed Fleetwood to rectify the situation, and also requested that Fleetwood repurchase the loan. No garage or decks were ever installed, and in fact "it was physically impossible to put a garage on the property." Instead, without Plaintiffs' permission, Fleetwood erected a fence on Plaintiffs' property worth approximately $1,000.

{7} Fleetwood also failed to deliver a custom home. The home it delivered did not have the custom features Plaintiffs' ordered, although Fleetwood removed the "fancier" items as Plaintiffs requested. In addition, the setup of the home was substandard. A general contractor and certified home inspector testified that the setup would not pass a Housing and Urban Development inspection for numerous reasons. Fleetwood installed the home on a temporary foundation instead of on a required permanent foundation. The home was not aligned properly, leaving a one-to-three-inch gap between the two halves of Plaintiffs' mobile home. The resulting crack in the roof near Plaintiffs' kitchen and hall bathroom allowed light, dirt, and insects into the home. The misalignment also resulted in increased utility bills and an onslaught of dust, mosquitos, moths, and roaches. In addition, duct work on the roof was covered with tape instead of a lid and screws, a torn rubber grommet allowed moisture to enter the house, and many shingles were missing. Numerous interior and exterior walls were uneven and loose, and quarter-inch screws were sticking out of some walls. Windows and doors throughout the home were difficult to open and close. Inside, the floors were uneven in several places, and ceiling panels, trim, and molding throughout the home were loose and uneven. The walls were covered with soot, and the carpet was filthy. Plaintiffs could hear leaks in the walls and saw water on the floors.

{8} Plaintiffs called Pike and Lancaster several times regarding the problems with their home. Because "Lancaster was not adequately taking care of their service issues," Fleetwood's zone district manager William Kasprzyk visited the site and made a list of the problems. He also "made a comment like he didn't believe how that mobile home made it out of the lot in the condition it was in." Fleetwood made some repairs to the home, such as covering the soot on the walls with wallpaper, touching up the paint, fixing a leak in the master bathroom and replacing the bathtub. However, Fleetwood left a hole in the wall after fixing the leak and cracked the wall when installing the new tub. Kasprzyk never conducted a follow-up visit, and the major repairs, such as remov-ing the gap between the two halves of the home, have not been completed.

## II.  PROCEDURAL BACKGROUND

{9} Plaintiffs sued Fleetwood in district court alleging fraud, conversion, violation of the Unfair Practices Act (UPA), breach of warranty, and other claims. Fleetwood filed a counterclaim to collect on the promissory note executed by Plaintiffs. The trial court entered judgment in favor of Plaintiffs and awarded them damages for fraud, conversion, and violations of the UPA. In addition, the trial court awarded punitive damages for Fleetwood's fraud and conversion, trebled the damages for the willful UPA violations, and dismissed Fleetwood's counterclaim for payment on the mortgage note without prejudice. The trial court also awarded Plaintiffs costs and attorney fees. After Fleetwood filed a motion to amend the judgment, the trial court reduced the punitive damages award.

{10} On appeal, the Court of Appeals found that some of the damages for fraud and conversion were duplicated and reduced both awards, and the Court of Appeals reversed all but one of the trial court's findings pertaining to the additional UPA violations. *Chavarria*, 2005–NMCA–082, ¶¶ 17, 24–26, 137 N.M. 783, 115 P.3d 799. The Court of Appeals also reversed the entire punitive damages award because, in its view, the evidence did not support corporate ratification. *Id.* ¶¶ 29–33. The Court of Appeals refused to consider Plaintiffs' argument based on a managerial capacity theory after concluding that Plaintiffs did not raise the theory until after trial. *Id.* ¶ 34. Finally, the Court of Appeals reinstated Fleetwood's counterclaim for payment on the note and remanded to the trial court for a recalculation of attorney fees in light of its opinion. *Id.* ¶¶ 38, 46.

## III.  COMPENSATORY DAMAGES

### A.  Fraud

█ {11} The trial court awarded Plaintiffs $17,900 for fraud based on Fleetwood's failure to deliver a garage and decks worth $9,500 and based on Fleetwood depriving Plaintiffs of $8,400 in value related to the

trade-in. The Court of Appeals reversed $8,400 of the compensatory award because, in its view, allowing Plaintiffs to recover damages for loss of value on the trade-in, in addition to damages for the nonexistent garage and decks, would amount to a double recovery. *Chavarria*, 2005–NMCA–082, ¶ 22, 137 N.M. 783, 115 P.3d 799. The lynchpin of the Court of Appeals' analysis was that there was no evidence that Fleetwood inflated the sales price of Plaintiff's home by approximately $18,000. Instead, according to the Court of Appeals, there was only evidence of a $9,500 inflation. *Id.* ¶¶ 19–22. Plaintiffs argue that they are entitled to the trial court's full award of $17,900 because Fleetwood inflated the price of the three-bedroom home by *both* the amount charged for the garage and decks that Fleetwood never intended to construct *and* the amount given Plaintiffs for their trade-in. We agree with Plaintiffs and reverse the Court of Appeals on this issue.

{12} We will uphold a trial court's findings if they are supported by substantial evidence. *Tome Land & Improvement Co. v. Silva*, 83 N.M. 549, 552, 494 P.2d 962, 965 (1972). Substantial evidence is "that which a reasonable mind accepts as adequate to support a conclusion." *Bill McCarty Constr. Co. v. Seegee Eng'g Co.*, 106 N.M. 781, 783, 750 P.2d 1107, 1109 (1988). Because the trial court appears to have adopted virtually all of Plaintiffs' requested findings of fact and conclusions of law verbatim, we examine this case " 'with a more critical eye to insure that the trial court has adequately performed its judicial function.' " *United Nuclear Corp. v. Gen. Atomic Co.*, 96 N.M. 155, 204, 629 P.2d 231, 280 (1980) (quoting *Ramey Constr. Co. v. Apache Tribe*, 616 F.2d 464, 467 (10th Cir.1980)).

{13} Fleetwood concedes that it charged $9,500 for nonexistent garage and decks and that Plaintiffs are entitled to $9,500 in damages. This amount is not at issue, and the only question we must address is whether there is evidence of an additional inflation of roughly $8,400. Regarding this additional $8,400, there is some evidence that Fleetwood gave Plaintiffs a credit of $8,409.20 for the trade-in of their mobile home. There-fore, in order for Plaintiffs to recover the trial court's full award, there must be evidence in the record to support their contention that this credit is illusory and that Defendant inflated the price of their mobile home by an amount that would consume both the charge for the garage and decks and the down payment. Plaintiffs persuasively argue that the evidence demonstrates a pattern of Fleetwood "manipulating the numbers so it is difficult to figure out exactly where all the overcharges are hidden." However, when we look at the evidence and the reasonable inferences that may be drawn from it, we conclude that there is sufficient evidence to support the trial court's finding that Fleetwood inflated the price of the mobile home so as to deprive Plaintiffs of the value of their trade-in, as well as the amount charged for the garage and decks.

{14} Both parties direct us to examine the advanced calculation sheets for the four-bedroom mobile home that Plaintiffs initially qualified for and the three-bedroom mobile home they ultimately received. To assist us in interpreting the advance calculation sheets, we have referred to Exhibit 13, the Retailer Advance financing guidelines from GreenPoint, which indicate that the sales price of a mobile home is not to exceed 130% of the net manufacturer's invoice for purposes of GreenPoint financing. This percentage calculation is referred to as an adjusted invoice.

{15} Exhibit 33, the advance calculation sheet for the three-bedroom home relied on by the parties, shows a net manufacturer's invoice of $18,511. Multiplied by 130%, the adjusted invoice equals $24,064. The sales price for the three-bedroom home is listed as $39,100. This $39,100 sales price includes a $2,000 charge for a patio or decks, but does not include the $7,500 charged for a garage. Adding the $7,500 fee for the garage to the sales price of the home, the actual sales price was $46,600. Subtracting the adjusted invoice price of $24,064 from the $46,600 sales price leaves $22,536.

{16} A similar calculation with the four-bedroom home price demonstrates one way the trial court may have found that Defendant inflated the price of Plaintiffs' mobile

home. Exhibit 19, the advance calculation sheet for the four-bedroom home relied on by the parties, shows a net manufacturer's invoice of $32,377. Multiplied by 130%, the adjusted invoice for the four-bedroom home is $42,090. Subtracting the adjusted invoice price of $42,090 from the sales price of $46,000 for the four-bedroom home equals $3,910. Comparing the difference in value between the adjusted invoice price and sales price for both the three- and four-bedroom homes, a reasonable inference may be drawn that Fleetwood inflated the sales price of the three-bedroom home by $18,626 more than the amount by which it inflated the sales price of the four-bedroom home ($22,536 minus $3,910). This $18,626 inflation of the price of the three-bedroom home supports the trial court's finding that Fleetwood defrauded Plaintiffs out of $9,500 related to the nonexistent garage and decks *and* $8,400 of value on the trade-in.

{17} Another reasonable inference that can be drawn from the evidence is that Fleetwood was willing to sell Plaintiffs the four-bedroom home for an adjusted invoice price of $42,090 and a sales price of $46,000. Fleetwood instead persuaded Plaintiffs to buy a three-bedroom home with an adjusted invoice price of $24,064 and a sales price of $46,600. The invoice prices indicate that the three-bedroom home should have cost Plaintiffs $18,026 less than the four-bedroom home, not $600 more than the four-bedroom home. We conclude that there is substantial evidence supporting the trial court's compensatory damages award for fraud, and we reinstate the full award of $17,900.

**B. Conversion**

■ {18} The trial court awarded Plaintiffs $17,000 for conversion related to the garage, decks, and trade-in. Specifically, the trial court found that Fleetwood converted $7,500 in value from Plaintiffs' trade-in and $9,500 in loan proceeds to pay for the nonexistent garage and decks. The Court of Appeals reversed all but $9,500 of Plaintiffs' conversion award on the same theory that it used to reverse a portion of Plaintiffs' fraud award. *Chavarria,* 2005–NMCA–082, ¶ 23, 137 N.M. 783, 115 P.3d 799. Because there

is sufficient evidence that Plaintiffs did not receive value for their trade-in, we conclude that the Court of Appeals erred in reversing a portion of Plaintiffs' conversion damages. We reinstate the trial court's full award of $17,000 for conversion.

**C. UPA Violations**

■ {19} For Fleetwood's UPA violations, the trial court awarded Plaintiffs $9,500 in actual damages for misrepresentations regarding the garage and decks, and "an additional $6,220 in actual damages for Defendant's misrepresentations pertaining to the failure to deliver a custom home, additional utility charges, inconvenience and aggravation, and the sale of insurance." The Court of Appeals reversed all of the additional award except for $1,700 for Fleetwood's failure to deliver a custom home. *Chavarria,* 2005–NMCA–082, ¶¶ 24–26, 137 N.M. 783, 115 P.3d 799. Plaintiffs do not challenge the reversed awards on appeal. Therefore, Plaintiffs are entitled to the two surviving UPA awards: $9,500 for the garage and decks and $1,700 for Fleetwood's failure to deliver a custom home. Plaintiffs do not have to elect damages on the $1,700 UPA award for failure to deliver a custom home. This award is separate from the fraud and conversion awards and thus survives independent of the awards given for those causes of action.

**IV. CORPORATE LIABILITY FOR PUNITIVE DAMAGES**

{20} The trial court awarded Plaintiffs punitive damages against Fleetwood based on the fraudulent conduct of Fleetwood's employees. Fleetwood does not dispute the trial court's finding that Pike and Lancaster committed fraud in this case but argues it should not be held liable for the punitive damages award. The Court of Appeals agreed with Fleetwood, concluding that the evidence did not support a finding of corporate ratification. *Chavarria,* 2005–NMCA–082, ¶¶ 29–33, 137 N.M. 783, 115 P.3d 799. The Court of Appeals also declined to consider Plaintiff's managerial capacity theory because it "was not clearly raised by Plaintiffs until their response to Defendant's motion to

amend judgment." *Id.* ¶ 34. We disagree, and we reverse the Court of Appeals on this issue.

{21} A corporation may be held liable for punitive damages for the misconduct of its employees if: (1) corporate employees possessing managerial capacity engage in conduct warranting punitive damages, *Albuquerque Concrete Coring Co. v. Pan Am World Servs., Inc.*, 118 N.M. 140, 144–45, 879 P.2d 772, 776–77 (1994); (2) the corporation authorizes, ratifies, or participates in conduct that warrants punitive damages, *id.* at 143–44, 879 P.2d at 775–76; or (3) under certain circumstances, the cumulative effects of the conduct of corporate employees demonstrate a culpable mental state warranting punitive damages, *Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 270, 881 P.2d 11, 15 (1994).

{22} In both their complaint and amended complaint, Plaintiffs pled facts that would give rise to an award of punitive damages against Fleetwood and requested punitive damages as a form of relief. This pleading complied with the notice requirements of Rule 1–008(A) NMRA, which only requires a short and plain statement of a party's claim and a demand for relief. A specific pleading of the theory that supports an award of punitive damages against the corporation is not required by the rules.

{23} In addition, Plaintiffs expressly relied on the managerial capacity theory in closing argument. We fail to see how it would be unfair to Defendant to rely on a managerial capacity theory here, and we examine the record to determine whether the evidence supports the judgment. In doing so, we resolve all disputed facts and indulge all reasonable inferences in favor of the judgment. *Coates v. Wal-Mart Stores, Inc.*, 1999–NMSC–013, ¶ 46, 127 N.M. 47, 976 P.2d 999. Although Plaintiffs need only prove one theory of punitive damages in order to succeed, we conclude that the evidence supports an award under the theories of managerial capacity and corporate ratification. We do not address the theory of corporate indifference.

## A. Managerial Capacity

{24} A corporation may be liable for punitive damages for the wrongful acts of employees who are acting within the scope of employment and who are employed in a managerial capacity. *Albuquerque Concrete Coring Co.*, 118 N.M. at 144–45, 879 P.2d at 776–77. This theory of liability derives from the Restatement (Second) of Torts Section 909(c) (1979) and the Restatement (Second) of Agency Section 217(C)(c) (1958), which we adopted in *Albuquerque Concrete Coring Co.*, 118 N.M. at 145, 879 P.2d at 777. The trial court concluded that Pike, Lancaster, Gifford, and Kasprzyk were acting within the course and scope of their employment at all times material to the transaction with Plaintiffs. Fleetwood does not challenge these findings, and there is ample evidence in the record that these employees' acts were fairly and naturally incidental to the business Fleetwood assigned them and were done while engaged in Fleetwood's business with the view of furthering Fleetwood's interest. *See* UJI 13–407 NMRA; *Narney v. Daniels*, 115 N.M. 41, 48, 846 P.2d 347, 354 (Ct.App. 1992) ("Generally, whether an employee is acting in the course and scope of employment is a question of fact."). The question remains whether any of these participants possessed managerial capacity.

{25} An employee has managerial capacity if he or she has the discretion or authority to "speak and act independently of higher corporate authority." *Brashear v. Baker Packers*, 118 N.M. 581, 583, 883 P.2d 1278, 1280 (1994). In *Albuquerque Concrete Coring Co.*, we noted how "[i]n the modern world of multinational corporations, corporate control must be delegated to managing agents who may not possess the requisite upper-level executive authority traditionally considered necessary to trigger imposition of corporate liability for punitive damages," and we rejected the traditional standard requiring wrongful acts committed by an employee with the "whole executive power" of the corporation. 118 N.M. at 146, 879 P.2d at 778. Instead, we noted that "[c]orporate liability for punitive damages should depend upon corporate responsibility for wrongdoing, not corporate ability to insulate top executives

from daily, hands-on management." *Id.* Therefore, we concluded that "[j]ob titles, in and of themselves, are not necessarily dispositive." *Id.* at 145, 879 P.2d at 777. The "key in determining whether an agent acts in a managerial capacity is to look at the nature of what the agent is authorized to do by the principal and whether the individual has discretion regarding both what is done and how it is done." *Id.*

■ {26} Fleetwood argues that it is not liable for punitive damages because Lancaster was not employed in a managerial capacity. We disagree. Lancaster was employed by Fleetwood as the general manager of its Las Cruces office at the time that he and Pike sold the mobile home to Plaintiffs. Fleetwood general managers were responsible for the financing of mobile homes, and the evidence indicates that Lancaster dealt directly with GreenPoint regarding Plaintiffs' financing without oversight from upper-management. General managers were also responsible for advertising and for determining the value of trade-ins. When asked in his deposition how Lancaster was able to get away with his misconduct without it being detected sooner, Jim Gifford replied: "Any paperwork coming through would look simply normal as far as if a garage was going to be put on. I mean, you can't oversee, on a daily basis, every deal. That's why you have a general manager in a store. That is his responsibility, to put business together." Gifford also discussed how Fleetwood depends on general managers providing the company with correct information, and Kasprzyk testified that he confronted Lancaster instead of Pike regarding the nonexistent garage and decks "because the whole deal was Bob Lancaster's responsibility as general manager of that store." Finally, Kasprzyk indicated that he did not fire Lancaster immediately upon learning of his fraudulent activity because of Lancaster's elevated status as a general manager. We conclude that Lancaster had sufficient discretionary authority "regarding both what is done and how it is done" to bind Fleetwood for punitive damages. *Id.*

{27} The evidence also indicates that Kasprzyk and Gifford were employed in a man-

agerial capacity. Vice-president Gifford was responsible for Fleetwood's operations and expansion in Arizona, Colorado, Nevada, and New Mexico, and he described himself as the "chief cook and bottlewasher" for the region. Gifford had the authority to repurchase Plaintiffs' $82,688.75 loan from GreenPoint without seeking corporate approval or authorization. Gifford's zone district manager, Kasprzyk, was the "day-to-day" supervisor for "approximately 13 stores between New Mexico, Arizona and Colorado." Kasprzyk, who had trained Pike and Lancaster, was the direct supervisor of the general managers of each store in his region and was also "physically responsible for all the actions of each individual store that [he] was supervising."

■ {28} Fleetwood concedes that Kasprzyk and Gifford were employed in a managerial capacity but argues that they were not involved in defrauding Plaintiffs. The evidence indicates otherwise. After GreenPoint discovered that a garage and decks had not been installed on Plaintiffs' land, GreenPoint notified Gifford that Fleetwood had falsely certified the construction of the garage and decks and requested that Fleetwood repurchase the loan. With this knowledge of fraud, Gifford placed Kasprzyk in charge of rectifying the situation. Kasprzyk confronted Lancaster in Las Cruces and asked, "Bob, do you understand what you've just done here? You've closed on a loan … and defrauded our lender." Instead of firing Lancaster in accordance with Fleetwood's "Call to Integrity" policy, which required "immediate dismissal" for falsification of information, Kasprzyk continued to leave Lancaster in charge.

{29} In addition, because a garage could not be placed on the property, GreenPoint authorized a substitution of "a fence of similar value" in place of the garage and decks. Without Plaintiffs' permission, Fleetwood erected a fence worth $1,000 as a substitute for the promised $9,500 in garage and decks. In their depositions, Kasprzyk and Gifford blamed each other for the substitution of the fence. Gifford said he left Kasprzyk in charge of remedying the situation and denied his involvement with the fence. However, Kasprzyk testified in his deposition that "Mr.

Gifford and Vangie out of the zone office were also involved in that transaction, in regards to the fence issue" and that "they had just told me that they were going to take and move forward and put a fence in for the value." At trial, Kasprzyk testified again that the "fence issue" "was being handled through the zone office directly with Green-Point Credit and the store itself." Kasprzyk denied any personal involvement with the fence substitution and testified that he left Lancaster in charge of remedying the consequences of the fraud. Gifford disputed Kasprzyk's claims when he testified that "Mr. Kasprzyk told me we were putting a fence on the property. Problem solved, as far as I was concerned." The trial court was at liberty to accept or reject their testimony, and we believe the evidence is sufficient to find that Pike, Lancaster, Kasprzyk, and Gifford each participated to some extent in defrauding Plaintiffs and GreenPoint. Therefore, Fleetwood is liable for punitive damages under a managerial capacity theory.

## B. Corporate Authorization, Ratification, and Participation

{30} A corporation may be liable for punitive damages for the fraudulent acts of an employee where the corporation in some way authorizes, ratifies, or participates in that fraudulent conduct. *Albuquerque Concrete Coring Co.*, 118 N.M. at 143–44, 879 P.2d at 775–76. This theory of liability is consistent with the Restatement (Second) of Torts Section 909(d) and the Restatement (Second) of Agency Section 217(C)(d), which indicate that a corporation is liable for punitive damages where the corporation or a managerial agent of the corporation ratifies or approves of the act. In *Brashear*, 118 N.M. at 583, 883 P.2d at 1280, we implicitly recognized Sections 909 and 217C, in their entirety, as being consistent with New Mexico law. While our adoption of these Restatement provisions has only been implicit, we take this opportunity to explicitly adopt Sections 909 of the Restatement (Second) of Torts and 217C of the Restatement (Second) of Agency. Therefore, proof of corporate ratification may include evidence that a managerial agent ratified, accepted, or acquiesced to the fraudulent conduct of corporate employees. *See Albuquerque Concrete Coring Co.*, 118 N.M. at 144, 879 P.2d at 776 ("A corporation can ratify the acts of its agents by acquiescence in or acceptance of the unauthorized acts.").

{31} In this case, Kasprzyk and Gifford, whom Fleetwood concedes were managerial agents, knew of the fraud committed by both Pike and Lancaster. The evidence is sufficient to support a finding that Kasprzyk and Gifford, with knowledge of the fraud related to the garage and decks, authorized the substitution of a fence worth $1,000 for the garage and decks. Knowing that Fleetwood had defrauded Plaintiffs and substituted a fence without their permission, Fleetwood proceeded to pay Pike a full commission for his fraudulent sale, failed to discipline Lancaster, and did not fire Pike or Lancaster until another customer complained that the two had attempted to falsify income.

{32} Fleetwood also kept the $9,500 Plaintiffs had been wrongfully charged for the garage and decks. Although Gifford repurchased Plaintiffs' loan from GreenPoint on behalf of Fleetwood, he did not reduce the principal balance by the amount wrongfully charged for the garage and decks. Subtracting $9,500 from the principal would have reduced the interest points Plaintiffs had to pay by roughly $800, reduced Plaintiffs' monthly payments by $79, and reduced the total finance charges on the loan by roughly $28,000.

{33} Fleetwood's "policing system" offers further evidence of corporate ratification. According to Evangeline Bustamonte, Gifford's office manager, Fleetwood did not want Gifford's zone office to police the files of local offices for falsification. Policing the files would have alerted Fleetwood to Pike and Lancaster's falsification of Plaintiffs' income, and to the improper construction income related to the garage and decks. Furthermore, there is evidence that Fleetwood's centralized finance office received a "tool-belt" sheet showing construction income "that doesn't make any sense" and should have alerted Fleetwood to the fraudulent activity. However, despite the fraud that occurred in this case, Fleetwood did not change

its financing procedure or how its zone offices were to supervise local offices. We conclude that the conduct attributable to Fleetwood constitutes the substantial evidence needed to uphold the trial court's award of punitive damages for ratification, authorization, or participation. *See Brashear*, 118 N.M. at 583–84, 883 P.2d at 1280–81; *see also Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc.*, 97 N.M. 266, 270, 639 P.2d 75, 79 (Ct.App.1981) ("A principal who expressly or impliedly elects to ratify unauthorized acts of an agent will not be permitted to accept the benefits and reject the burdens of the acts.").

{34} Fleetwood argues that punitive damages are inappropriate in this case because, under Fleetwood's view of the evidence, Gifford and Kasprzyk merely left Lancaster in charge of rectifying the situation and Lancaster compounded the fraudulent scheme. Even if we were to accept Fleetwood's view of the evidence, placing a wrongdoer like Lancaster in charge of rectifying his own fraudulent activity under such circumstances would alone demonstrate an "acquiescence in or acceptance of" Pike and Lancaster's fraudulent activity. *Albuquerque Concrete Coring Co.*, 118 N.M. at 144, 879 P.2d at 776. There is sufficient evidence to support the trial court's findings that Fleetwood is liable for punitive damages under the theory of corporate ratification.

## V. CONSTITUTIONALITY OF PUNITIVE DAMAGES AWARD

{35} The trial court awarded Plaintiffs punitive damages in the amount of $250,000 for Fleetwood's fraud and conversion. Fleetwood filed a motion to amend the judgment, arguing in one section of its motion that the trial court's award of punitive damages was unconstitutionally large because the ratio of punitive damages to compensatory damages exceeded ten-to-one. In response to Fleetwood's motion, the trial court reduced the punitive damages award "to a ratio not to exceed 10:1," or $150,000. The Court of Appeals did not address the constitutionality issue because it reversed the entire punitive damages award. Plaintiffs now ask us to reinstate the trial court's initial award of $250,000, or in the alternative, trial court's reduced award of $150,000.

{36} In reducing its original punitive damages award, the trial court appears to have focused on the ratio of punitive damages to compensatory damages. However, the relationship between punitive and compensatory damages is but one of the factors we consider in assessing the constitutionality of a punitive damages award. Our de novo review of the amount of Plaintiffs' punitive damages award is essentially a review for reasonableness. *See Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002–NMSC–021, ¶ 19, 132 N.M. 401, 49 P.3d 662; *see also* UJI 13–1827 ("The amount of punitive damages must be based on reason and justice taking into account all the circumstances, including the nature of the wrong and such aggravating and mitigating circumstances as may be shown. The amount awarded, if any, must be reasonably related to the injury and to any damages given as compensation and not disproportionate to the circumstances."). In ascertaining the reasonableness of a punitive damages award, we are guided by three criteria derived from *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) and adapted to New Mexico jurisprudence in *Aken*, 2002–NMSC–021, ¶¶ 20–21, 23, 25, 132 N.M. 401, 49 P.3d 662. Those three criteria are as follows: (1) the reprehensibility of the defendant's conduct, or the enormity and nature of the wrong; (2) the relationship between the harm suffered and the punitive damages award; and (3) the difference between the punitive damages award and the civil and criminal penalties authorized or imposed in comparable cases. *Aken*, 2002–NMSC–021, ¶ 20, 132 N.M. 401, 49 P.3d 662.

{37} The United States Supreme Court has indicated that the degree of reprehensibility of a defendant's conduct is " '[t]he most important indicium of the reasonableness of a punitive damages award.' " *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (quoting *BMW*, 517 U.S. at 575, 116 S.Ct. 1589). In *BMW*, the United States Supreme Court concluded that the defendant's "conduct

evinced no indifference to or reckless disregard for the health and safety of others" and that "none of the aggravating factors associated with particularly reprehensible conduct [was] present." *Id.* at 576, 116 S.Ct. 1589. Unlike the conduct in *BMW,* this case involved a series of misrepresentations, forgeries, and fraudulent conduct that ultimately deprived a low-income couple of the four-bedroom home they wanted for their family and instead saddled them with a defective home of like size to their old home and at an increased financial obligation. While we will not revisit the entire spectrum of misconduct here, it is "eminently clear" to us that Fleetwood's "behavior exhibited consciousness of wrongdoing, such that [Fleetwood] should have expected, or had notice, that legal punishment was likely." *Aken,* 2002–NMSC–021, ¶ 21, 132 N.M. 401, 49 P.3d 662; *see also BMW,* 517 U.S. at 576, 116 S.Ct. 1589 (noting that deceitful conduct is more reprehensible than mere negligence). Fleetwood's repeated and deceitful acts, which subjected Plaintiffs' to an increased financial burden and substandard living conditions, demonstrate a reckless disregard for the welfare of a financially vulnerable family. *See Campbell,* 538 U.S. at 419, 123 S.Ct. 1513 (discussing factors for courts to consider in assessing reprehensibility). "[W]e conclude that a substantial award was necessary to meet the goal of punishing [Fleetwood] for its conduct and deterring it, and others similarly situated in the future, from engaging in such conduct." *Aken,* 2002–NMSC–021, ¶ 21, 132 N.M. 401, 49 P.3d 662.

{38} The second *BMW* guidepost asks us to compare the punitive damages award to the actual or potential harm suffered by Plaintiffs. *BMW,* 517 U.S. at 575, 116 S.Ct. 1589. Or, as *Aken* stated, "The test under the second guidepost in New Mexico is that '[t]he amount of an award of punitive damages must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice.'" 2002–NMSC–021, ¶ 23, 132 N.M. 401, 49 P.3d 662. Although *Campbell* indicated that punitive damage awards reflecting "a single-digit ratio between punitive and compensatory damages" are most likely to comport with due process,

538 U.S. at 410, 123 S.Ct. 1513, the United States Supreme Court has repeatedly declined "to impose a bright-line ratio which a punitive damages award cannot exceed." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513; *see also BMW,* 517 U.S. at 582, 116 S.Ct. 1589 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award."). Instead, the United States Supreme Court has discussed the need for a flexible approach, especially in situations involving egregious behavior, low compensatory damage awards, injuries that are difficult to detect, or non-economic harm that is not easily converted into a dollar value. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513; *BMW,* 517 U.S. at 582, 116 S.Ct. 1589. Given the truly reprehensible behavior in this case, the relatively low compensatory damage award, and the intangible nature of the harm that Plaintiffs suffered, we believe that a substantial punitive damages award was appropriate.

{39} The third *BMW* guidepost, described as the least important of the *BMW* indicia, involves a comparison between Plaintiffs' punitive damages award and potential civil and criminal sanctions. *Aken,* 2002–NMSC–021, ¶ 25, 132 N.M. 401, 49 P.3d 662. "The possibility of a jail sentence justifies a substantial punitive damages award." *Id.* ¶ 27. Aside from the surviving UPA violations, we note that several criminal statutes would potentially apply to fraudulent and deceitful conduct. Forgery and fraud and embezzlement involving property valued between $2,500 to $20,000 are third degree felonies. NMSA 1978, §§ 30–16–10(C), –6(E), –8(E) (2006). Third degree felonies in New Mexico are punishable by a basic sentence of three years in prison and a $5,000 fine. NMSA 1978, § 31–18–15(A)(8), (E)(8) (2005). We conclude that the potential civil and criminal penalties for conduct similar to that seen in this case weigh in favor of the reasonableness of a substantial punitive damages award, and that all three *BMW* guideposts weigh in favor of the reasonableness of the trial court's initial punitive damages award. While it appears that the trial court

reduced the initial punitive damages award under the mistaken belief that it reflected an unconstitutionally large ratio between compensatory and punitive damages, only the trial court knows the precise reasons for the reduction. Therefore, we remand this issue to the trial court to assess the punitive damages in this case consistent with this opinion.

## VI. FLEETWOOD'S COUNTERCLAIM

{40} The trial court dismissed, without prejudice, Fleetwood's counterclaim to collect on the promissory note signed by Plaintiffs to secure financing for their mobile home. Fleetwood appealed, and the Court of Appeals reinstated the counterclaim, remanding it to the trial court for further proceedings. *Chavarria*, 2005–NMCA–082, ¶¶ 36–38, 137 N.M. 783, 115 P.3d 799. We uphold the Court of Appeals' decision to reinstate Fleetwood's counterclaim.

{41} Plaintiffs argued at the trial level, and continue to argue on appeal, that Fleetwood failed to establish the essential element of its claim that it was the current holder of the promissory note, as required by NMSA 1978, § 55–3–308 (1992). Plaintiffs rely on the Arkansas case of *McKay v. Capital Resources Co.*, 327 Ark. 737, 940 S.W.2d 869, 871 (1997), in which the Arkansas Supreme Court held that a party could not enforce a promissory note when it had failed to produce the original note or explain its absence. We agree with Plaintiffs that a party seeking to enforce a promissory note must generally produce the note or demonstrate a right to enforce it. *See* § 55–3–308; NMSA 1978, § 55–3–301 (1992). However, in their answer to Fleetwood's counterclaim, Plaintiffs admitted that the note was "owned in all respects whatsoever" by Fleetwood. Before the start of the trial, the trial court also admitted into evidence a "set of original exhibits" offered by Plaintiffs. Plaintiffs' set of exhibits contained a copy of the promissory note. The Court of Appeals was correct in concluding that Plaintiffs waived their objection to Fleetwood's failure to produce the original note. *See Tassock v. Hogan*, 272 Or. 694, 538 P.2d 910, 912 (1975) (holding that a defendant who had admitted that the plaintiff was the owner and holder of a note could not

later challenge the plaintiff's failure to produce the note at trial). We *affirm the ruling* of the Court of Appeals on this issue, and we remand to the trial court for further proceedings on Fleetwood's counterclaim.

## VII. ATTORNEY FEES

{42} The trial court awarded Plaintiffs $79,943.73 in attorney fees under NMSA 1978, Section 57–12–10(C) (2005) of the UPA. The Court of Appeals affirmed the trial court's decision to award attorney fees. *Chavarria*, 2005–NMCA–082, ¶ 45, 137 N.M. 783, 115 P.3d 799. Because it reversed the trial court's award of UPA damages for additional utility expenses, inconvenience and aggravation, and the unauthorized sale of insurance, the Court of Appeals remanded the issue of attorney fees to the trial court for a redetermination of the appropriate amount. *Id.* ¶ 46. We uphold the decision of the Court of Appeals to remand this issue to the trial court.

{43} The Court of Appeals also denied Plaintiffs' request for attorney fees on appeal. *Id.* Because two of Plaintiffs' UPA awards survive appeal, the trial court may consider awarding Plaintiffs appellate attorney fees. *See Hale v. Basin Motor Co.*, 110 N.M. 314, 321–22, 795 P.2d 1006, 1013–14 (1990) (noting that UPA does not limit attorney fee and cost awards to trial level and that awarding appellate fees and costs "is entirely consistent with the statutory purpose of creating a private remedy to redress wrongs resulting from unfair or deceptive trade practices"). We remand to the trial court to determine the appropriate amount of attorney fees.

## VIII. CONCLUSION

{44} Plaintiffs are entitled to the trial court's full award of compensatory damages for fraud or conversion. In addition, Fleetwood's conduct supports the trial court's decision to award punitive damages. We remand this case to the trial court to set the appropriate amount of punitive damages and to determine the appropriate amount of attorney fees. We also remand for further proceedings on Defendant's counterclaim.

{45} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, Justices, and LYNN PICKARD, Judge (sitting by designation).