2008-NMCA-164

198 P.3d 376

**Val JOLLEY, Personal Representative of the Estate of John Everett Stapleton, deceased, Plaintiff–Appellee,**

v.

**ENERGEN RESOURCES CORPORATION, Defendant–Appellant.**

No. 27,489.

Court of Appeals of New Mexico.

Sept. 22, 2008.

Certiorari Denied, No. 31,375, Nov. 6, 2008.

Guebert, Bruckner & Bootes, P.C., Terry R. Guebert, Don Bruckner, Albuquerque, NM, for Appellee.

Holland & Hart, LLP, Bradford C. Berge, Trent A. Howell, Larry J. Montaño, Santa Fe, NM, Holland & Hart, LLP, Stephen G. Masciocchi, Denver, CO, for Appellant.

**OPINION**

VIGIL, Judge.

{1} Plaintiff is the personal representative of the estate of her son (Decedent) who was nineteen years old when he died. In this wrongful death case the jury awarded Plaintiff $2,957,000 in compensatory damages, which was reduced to $1,922,050 based on a finding that Decedent was 35 percent negligent and Defendant was 65 percent negligent. The jury also awarded Plaintiff $13,000,000 in punitive damages. We affirm.

**BACKGROUND**

{2} On Sunday, July 21, 2002, after recreating in the Glade Run Recreation Area (Glade Run Area) on Bureau of Land Management (BLM) land just north of Farmington, Decedent backed up the vehicle he was driving to turn around and return to Farmington. He backed into an unfenced, unprotected natural gas wellhead operated by Defendant, identified as the McCord 13 well. The wellhead exploded, and Decedent burned to death at the scene after running from the vehicle with his body on fire. Plaintiff's suit for wrongful death asserted that Defendant was negligent in that Defendant failed to exercise ordinary care to protect its exposed natural gas wellhead at McCord 13 from contact with motorized vehicles. Plaintiff also contended that Defendant's conduct was so reckless as to justify an award of punitive damages. The jury heard and considered the evidence during a six-day trial in which twenty-eight witnesses testified, and in which numerous documents, photographs, maps, and stipulations were admitted into evidence.

{3} Defendant acquired the McCord 13 well in 1997, along with approximately one thousand other natural gas wells in the San Juan Basin. The Glade Run Area where McCord 13 is located consists of sandy arroyos, slick rock, rolling terrain, and sparse vegetation and had been used for years for outdoor recreation. In 1988, the BLM designated the 33,800 acre Glade Run Area as a Recreation Management Area; and in 1996, the BLM designated the southern part of the Glade Run Area adjacent to Farmington as open for off-road vehicle use. Before the explosion at McCord 13, Defendant knew that it would be hazardous if a vehicle came into contact with a pressurized natural gas system, like a wellhead, and that it could kill someone. Notwithstanding this knowledge, Defendant did not erect any new fences or barricades around its unprotected wellheads. On the other hand, other natural gas companies operating in the Glade Run Area did erect fences and barricades around their natural gas wellheads near McCord 13 from as early as 1993 until the fall of 2001.

{4} A San Juan Deputy Sheriff testified that during his regular patrols of the Glade Run Area in the summer of 2002, he observed a fair, "almost substantial" amount of vehicular traffic pass through the middle of the McCord 13 well site, particularly on weekends. He added that he often saw young people parking in the area of the well because it was a "scenic view spot."

{5} The opinion of Defendant's general manager was that a barrier should have been put up around the wellhead to protect motorists who parked at the well and turned around to head back to Farmington. He also recognized that someone could back a vehicle into a wellhead and that an unprotected wellhead was a hazard. He conceded that Defendant should have done a risk assessment, and he admitted that the more serious the risk posed, the more likely it was that Defendant should have taken action. Backing into a wellhead and being killed was "the most serious risk" he could envision. He candidly told the jury that he should have been aware of teenagers parking at McCord 13 and fenced the wellhead.

{6} *From the time it made its acquisition in 1997 until the explosion in 2002, Defendant did not have a program to assess the risk associated with its well sites, and it had no discussions about fencing or barricading any of the wells in the Glade Run Area. Furthermore, Defendant had no published policy addressing safety at its well sites during this time. This was due to its "bottom-up" safety program, which placed the burden of safety on lower-level employees. Consequently, the operator who took care of McCord 13 and the equipment on a daily basis was also the person responsible for making safety recommendations concerning the well site. The operator knew that another wellhead he serviced, which was owned by Defendant just north and west of McCord 13, was protected with a pipe barricade; he knew that the purpose of this barrier was to keep trucks from running into the wellhead; and he recognized that if a vehicle ran into a wellhead, it could kill someone. On multiple occasions when the operator serviced McCord 13 before the explosion, he observed new tracks indicating that traffic had passed on both sides of the wellhead. However, Defendant did not provide him with any guidance for making safety recommendations, tell him anything about its policies and procedures to protect the public, or ask him to give recommendations about whether new fences or barricades were needed at any of its well sites.*

{7} *Plaintiff's oil field safety expert testified that it was his opinion that Defendant's conduct was both below the standard of care for the industry for an oil and gas operator and was reckless: (1) by failing to fence or barricade the McCord 13 site, (2) by failing to have a hazard analysis program, (3) by failing to have a top-driven safety policy, and (4) by failing to have a safety manual at the time of the explosion.*

{8} *The jury found that Defendant was negligent and determined that Plaintiff's total compensatory damages were $2,957,000. Since the jury also found that Decedent was 35 percent comparatively negligent, the compensatory damages award was reduced to $1,922,050. The jury also determined that because Defendant's conduct was reckless,*

*punitive damages were warranted. The jury adjudged that an award of punitive damages in the amount of $13,000,000 was appropriate to punish Defendant and to deter others from engaging in similar reckless conduct. Defendant's total assets are $2.6 billion; the amount of punitive damages assessed is one-half of one percent (0.5%) of its assets.*

{9} *Defendant appeals, arguing that (1) misconduct by Plaintiff's counsel during closing argument requires reversal and (2) the punitive damages award is unconstitutionally excessive.*

## I. CLOSING ARGUMENT OF PLAINTIFF'S COUNSEL

{10} Defendant argues that the trial court abused its discretion in failing to grant a mistrial or new trial because improper arguments of Plaintiff's attorney in closing arguments to the jury deprived Defendant of a fair trial. The arguments that Defendant complains of fall into two categories: (A) violations of the trial court order excluding post-accident remedial measures and (B) improper "Golden Rule" arguments.

### A. Post–Accident Remedy Arguments

{11} The trial court granted Defendant's motion in limine and directed that unless Defendant argued at trial· that fencing and barricading wellheads was not feasible, neither party was permitted to present evidence to the jury that, after the accident, Defendant fenced and barricaded McCord 13 and other wellheads in the area. Defendant argues on appeal that Plaintiff's counsel violated the order four times in his closing arguments to the jury.

{12} While arguing liability, Plaintiff's counsel said:

The [Bureau of Land Management] requires [Defendant] to protect the public if they're going to take all the public's oil and gas and make billions of dollars from it. That is the agreement that they adhered to. They signed that agreement. That agreement is in evidence. You can look at it.

Now, the clear answer is, should they have fenced? Should they have fenced,

based on everything you know at this point? I think the answer is, clearly, yes, they should have.

Were they negligent? Yes, they were. They didn't have the proper programs in place. They didn't do all their homework with respect to preparing their documents. *They, frankly, did not take safety seriously, and they don't today.*

(Emphasis added.)

{13} Turning to punitive damages, Plaintiff's counsel argued:

[T]he civil jury has an opportunity to correct wrongdoing in society in the civil matter. How do you do that? You have to impose a fine. Especially, with a corporation.

Now, I understand, if we're talking about an individual who might be making a few dollars a year, well, the fine doesn't have to be very big to learn their lesson. But that's not the case here, and I want to talk to you about it. Corporations work by profit and loss. Their conduct does not change, absent correcting economic circumstances. And correcting economic circumstances means you have to affect the bottom line before a corporation reacts. They just don't do it to be good citizens, because we know that in this case. We know they haven't done it. *Even as of today, we know they haven't done the right thing.* What we've got is an energy company and companies operating up there, taking the oil and gas, without the appropriate protections.

(Emphasis added.)

{14} In arguing what would be an appropriate amount of punitive damages, Plaintiff's counsel then asserted:

You want to get word to the boardroom? You want a change in conduct? This is how you do it. One-tenth of one percent ... is $2,618,000. One-half of one percent is ... $13,091,000. One percent, one per-cent—and I submit to you that when you start getting one percent, you might be getting there. You might be getting there. It's 26 million. It's a lot of money.

But unless you are willing as a group, as a jury, to accept the responsibility of the

social change that comes from making a tough decision like this, and imposing that kind of fine on them, you will not save any of the children of New Mexico or any of those children up there in Farmington. *You will not get them to fence anything, because they won't do it absent the economic stimulus.* That's just the way it works.

(Emphasis added.)

{15} There were no objections to the foregoing arguments at the time they were made. Defendant waited until Plaintiff's counsel completed his closing argument, and the court recessed before objecting. During the recess, Defendant objected to the closing argument and requested a mistrial, claiming that "on two different occasions just now in [counsel's] closing argument, he made reference to corrective—or the absence of corrective action supposedly not taken by this Defendant after the accident." Defendant also requested that the jury be instructed that McCord 13 was fenced within two weeks of the accident. Plaintiff's counsel responded that the argument was not improper because there was evidence, introduced by Defendant, that wells were present in the area that were not fenced.

{16} The trial court determined that the statements were improper, but denied Defendant's motion for a mistrial. The trial court also declined to instruct the jury that McCord 13 was fenced after the accident. Instead, it instructed the jury:

In [Plaintiff's counsel's] arguments, on at least one occasion, he made reference to the idea that no corrective action had been taken by [Defendant] up to today. I want to state that there is no evidence before you on that issue as to what, if any, corrective action was taken. And I am instructing you that you must disregard that portion of [Plaintiff's counsel's] argument.

{17} In rebuttal closing argument, after the jury was given the instruction, Plaintiff's counsel said:

You know, their argument is that [Decedent] was drinking.

... Now, you talk about me mentioning something that's not in evidence. I mean,

what evidence is there of that? There is absolutely none. But that's the whole purpose here. What I say is not evidence. What [defense counsel] says is not evidence. You have to rely on your memory about what the evidence is, and rely on that.

Plaintiff's counsel then continued,

Let me ask you something. When you go fill up your car with gas, you pull up to the pump, and you see those concrete barriers by the pump, and you see every one of them has a mark on them. Every one of them has a buff mark on it because somebody hit it. Sure. Did they hit it on purpose? No, they don't hit it on purpose. It's an accident. But we know, the service station operators know, the people that sell that gasoline know, that if you hit the pump, it could be dangerous. And they know that people make mistakes, just like [Defendant] knew that somebody could back into a wellhead. But what they did is they protect those well pumps, gasoline pumps, by putting a barrier there so that someone won't run into it and get hurt. *And that's what we're saying [Defendant] should have done, and that's what we're saying they refused to do, acknowledge, even as of right now.*

(Emphasis added.) Defendant made no objection to this argument at trial.

## B. Golden Rule Arguments

{18} While discussing compensatory damages in his closing argument, Plaintiff's counsel also said:

The value of life. You have to make a decision on what life is worth. What is life worth to live? It's a difficult thing to do. What you normally do is you look at how long you have yet to live, and the quality of your life. Now, [Decedent] was a young man, he had no health problems; and he had 55.4 years left to live. Now, when you reach the age of 60, 55, you start thinking, "Well, how much is the rest of my life worth? Would I give up my life in the next 20 years for a million dollars? Would I give it up for 2 million?" Boy, that's a tough decision. I can guarantee that most

people wouldn't do it. And when you sit down to start thinking about what it's worth to be with your wife and children, what it's worth to spend the holidays with the family, what it's worth to go on vacation, what it's worth to look at the birds[.]

{19} Defendant asked to approach the bench and objected, asserting that Plaintiff's counsel was making Golden Rule arguments by asking the jurors to determine what life would be worth to them. The trial court agreed and warned Plaintiff's counsel to use "general terms and not put the jurors, themselves, in the terms of the Plaintiff."

{20} Plaintiff's counsel continued with his argument and later said:

Now, when you go to the funeral home, or when an individual goes to a funeral home, and you go and somebody's lost a relative. What's the first thing you tell them? You say, "I hope he didn't suffer. I hope he didn't suffer." Yeah. Because that's a very, very significant issue to a compassionate human being, that they not suffer.

{21} Plaintiff's counsel continued by describing the pain Decedent endured and details of his death, indicating that it took two minutes for him to burn to death. Plaintiff's counsel then stated, "At some point, just wait two minutes. Just sit there for two minutes and think of somebody suffering in that type of excruciating pain for two minutes. This is the most horrific death possible." Defendant made no objection to the comments in the preceding two paragraphs.

## C. Post-Judgment Motion

{22} After judgment was entered, Defendant moved for a new trial, asserting that the closing argument of Plaintiff's counsel was improper and prejudicial. Defendant asserted that in closing, counsel implied that Defendant had never fenced the well after the accident, violated the order in limine, commented dismissively on the trial court's admonition, continued to violate the order in rebuttal, and made prohibited "Golden Rule" arguments. Moreover, Defendant continued, because the trial court had rejected Defendant's request that the jury be informed that it had fenced the McCord 13 wellhead within two weeks of the accident, the jury was left

with the false impression that Defendant still had not fenced it.

{23} At the hearing on the motion, the trial court expressed its belief that inferences could be drawn from the closing argument of Plaintiff's counsel that were inconsistent with the ruling on Defendant's motion in limine; and specifically, "the argument that was made clearly inferred that there had been no action taken as to that well [McCord 13] even up to the time of trial." However, the trial court also determined that counsel did not intentionally violate its order on the motion in limine and that "the admonition that the court provided was adequate, and that the jury would follow that admonition and not consider those arguments in reaching their conclusion." The trial court further ruled that the Golden Rule arguments made by Plaintiff's counsel were "comparatively small." Defendant's motion was denied.

**D. Analysis**

{24} A motion to declare a mistrial is addressed to the sound discretion of the trial court, and our review is limited to determining whether that discretion was abused. *Transwestern Pipe Line Co. v. Yandell*, 69 N.M. 448, 460, 367 P.2d 938, 946 (1961), *superseded by statute on other grounds as stated in Santa Fe S. Ry. v. Baucis Ltd. Liab. Co.*, 1998–NMCA–002, ¶ 17, 124 N.M. 430, 952 P.2d 31. We also apply the deferential abuse of discretion standard in reviewing a trial court's decision on whether to grant a new trial due to improper arguments of counsel. *Enriquez v. Cochran*, 1998–NMCA–157, ¶ 131, 126 N.M. 196, 967 P.2d 1136. "An abuse of discretion will be found when the trial court's decision is clearly untenable or contrary to logic and reason." *Newsome v. Farer*, 103 N.M. 415, 420, 708 P.2d 327, 332 (1985). In this environment of discretion, a judgment may be reversed because of arguments of counsel only when (1) the argument is improper and (2) the appellate court is satisfied that the argument was reasonably calculated to cause, and probably did cause, an improper verdict in the case. *See Benavidez v. City of Gallup*, 2007–NMSC–026, ¶ 16, 141 N.M. 808, 161 P.3d 853.

{25} The trial court instructed the jury that there was no evidence as to whether Defendant did or did not take corrective action after the accident and instructed the jury to disregard any portion of Plaintiff's arguments that might suggest that Defendant had not taken such corrective action. The trial court determined that these instructions were sufficient to cure any potential prejudice resulting from Plaintiff's arguments. We are satisfied that in making this determination, the trial court did not abuse its discretion.

{26} The pretrial order was that neither party was permitted to present evidence that after the accident Defendant fenced McCord 13 and other wells in the area. Both parties complied with the order, and no such evidence was offered by either party. On the other hand, there was evidence that when Defendant acquired its wellheads in the San Juan Basin in 1997, it did not erect fences or barricades around unprotected wellheads at that time. Furthermore, there was evidence that Defendant knew that people from Farmington recreated in the area where McCord 13 was operated; that a vehicle coming into contact with a pressurized natural gas system was hazardous and could kill someone; that, despite this knowledge, Defendant did not erect a fence or barricade around McCord 13; that another wellhead operated by Defendant near McCord 13 was protected by a pipe barricade; that other natural gas companies operating in the Glade Run Area did erect fences and barricades on wellheads near McCord 13; and that Defendant's general manager admitted that Defendant should have fenced the wellhead at McCord 13.

{27} Only one of the statements complained of can be construed as a statement that as of the *present* time, Defendant had still failed to erect a barricade or fence around McCord 13. That is the statement, "We know they haven't done it. Even as of today, we know they haven't done the right thing." To be sure, this statement should not have been made. However, in assessing whether it was unduly prejudicial, we are reminded: "The trial judge is in a much better position [than we are on appeal] to

know whether a miscarriage of justice has taken place and his opinion is entitled to great weight in the absence of a clearly erroneous decision." *Transwestern Pipe Line Co.*, 69 N.M. at 460, 367 P.2d at 946. We cannot conclude that the trial court's conclusion that this single comment did not deprive Defendant of a fair trial following a six-day trial in which twenty-eight witnesses testified and numerous documents, photographs, maps, and stipulations were admitted into evidence is clearly erroneous.

{28} Furthermore, to the extent the comment could have been improperly construed by the jury as argument that Defendant failed to take any corrective action after the accident, the instruction to disregard all arguments making any such suggestion was sufficient. "There is a presumption that the jury understood and complied with the court's instructions." *Vigil v. Miners Colfax Med. Ctr.*, 117 N.M. 665, 670, 875 P.2d 1096, 1101 (Ct.App.1994). With regard to the rebuttal closing arguments, which were not objected to when made, we conclude they were a fair comment on the evidence set forth above in ¶ 26, which was admitted. Finally, with regard to the alleged Golden Rule arguments, the trial court warned Plaintiff's counsel to use general terms at the bench conference and, after the admonishment, there were no further objections by Defendant.

{29} We hold that the trial court did not abuse its discretion in denying Defendant's motion for a mistrial or Defendant's motion for a new trial.

## II. PUNITIVE DAMAGES AWARD

{30} The evidence was clearly sufficient for the jury to conclude that the conduct of Defendant was reckless and warranted an award of punitive damages, and Defendant does not argue otherwise. Defendant's argument is that the amount of punitive damages award is grossly excessive and therefore unconstitutional. *See Bogle v. Summit Inv. Co.*, 2005–NMCA–024, ¶ 33, 137 N.M. 80, 107 P.3d 520 (recognizing that as stated in *Cooper Industries v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433–34, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), punitive damage awards

that are "grossly excessive" violate the Eighth and Fourteenth Amendments to the United States Constitution).

{31} In considering on appeal whether a punitive damages award violates due process, we consider the factors set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). *Aken v. Plains Elec. Generation & Transmission, Coop., Inc.*, 2002–NMSC–021, ¶ 19, 132 N.M. 401, 49 P.3d 662. Those factors are:

> 1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* ¶ 20. In our analysis of these factors, our review of the record is de novo. *Bogle*, 2005–NMCA–024, ¶ 33, 137 N.M. 80, 107 P.3d 520; *Aken*, 2002–NMSC–021, ¶¶ 18, 19, 132 N.M. 401, 49 P.3d 662. However, our review is not truly de novo review. Our task is limited to determining whether the amount of the award is grossly excessive and therefore within or beyond the outer limits of due process. In this de novo review we do not ourselves determine the actual award of punitive damages. Thus, we preserve the constitutional right of the parties to have the jury decide the case, while at the same time performing our constitutional duty to insure that the award does not violate due process. *See Chavarria v. Fleetwood Retail Corp.*, 2006–NMSC–046, ¶ 36, 140 N.M. 478, 143 P.3d 717 (stating that appellate review of the amount of a plaintiff's punitive damages award is essentially a review for reasonableness). Moreover, in our review of the *BMW* factors, any doubts we may have "concerning the question of what appropriate damages may be in the abstract, or owing to the coldness of the record, should be resolved in favor of the jury verdict." *Atler v. Murphy Enters., Inc.*, 2005–NMCA–006, ¶ 23, 136 N.M. 701, 104 P.3d 1092 (quoting *Aken*, 2002–NMSC–021, ¶ 19, 132 N.M. 401, 49 P.3d 662).

{32} First, we evaluate the degree of reprehensibility of Defendant's misconduct. "The United States Supreme Court has indicated that the degree of reprehensibility of a defendant's conduct is '[t]he most important indicium of the reasonableness of a punitive damages award.'" *Chavarria,* 2006–NMSC–046, ¶ 37, 140 N.M. 478, 143 P.3d 717 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)). In evaluating this factor, we compare the damages to the enormity of Defendant's wrong *apart* from the actual injury sustained. *Aken,* 2002–NMSC–021, ¶ 23, 132 N.M. 401, 49 P.3d 662. We consider five categories of conduct to determine reprehensibility. These are whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co.,* 538 U.S. at 419, 123 S.Ct. 1513.

{33} We conclude that Defendant's conduct in this case was sufficiently reckless to support a substantial award of punitive damages. Defendant knew that there was a hazard of someone colliding with the wellhead, knew that if that happened serious bodily harm or death could result, knew that the well site was in a highly traveled area, knew that erecting a barricade or fence would prevent the hazard, and still chose not to barricade the well site. As a result, when nineteen-year-old Decedent accidentally backed his car into Defendant's unprotected wellhead, the wellhead exploded, and Decedent burned to death at the scene after running from the car with his body on fire. Testimony from a burn care expert is that burning to death, as Decedent did in this case, is one of the most horrific ways to die.

{34} Out of the five categories of conduct that we are to consider, two are not applicable: whether the target of the conduct had financial vulnerability and whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. The remaining three categories of conduct we consider all weigh in favor of finding that Defendant's conduct was outrageous to such a degree as to warrant significant punitive damages. Defendant's conduct resulted in excruciating physical harm and death. Additionally, Defendant's conduct was repetitive: it failed to act despite knowledge from a prior incident at a sister company that a vehicle coming into contact with a pressurized natural gas system, like a wellhead, could kill someone. Finally, for five years, from the time it acquired its wellheads in 1997 until the accident in 2002, it took no action to protect wellheads, despite its knowledge that excruciating physical harm and death could result by its inaction. Thus, Defendant's conduct evinced, in a non-isolated manner, indifference and a reckless disregard for the safety of the public. We conclude that in light of this conduct, "a substantial award was necessary to meet the goal of punishing [Defendant] for its conduct and deterring it, and others similarly situated in the future, from engaging in such conduct." *Chavarria,* 2006–NMSC–046, ¶ 37, 140 N.M. 478, 143 P.3d 717 (internal quotation marks and citation omitted).

{35} Our second inquiry requires a comparison of the "ratio [of punitive damages] to the actual harm inflicted on the plaintiff." *Aken,* 2002–NMSC–021, ¶ 23, 132 N.M. 401, 49 P.3d 662 (alteration in original) (quoting *BMW,* 517 U.S. at 580, 116 S.Ct. 1589). Under this prong, unlike the first, we *do* consider the actual injury sustained by Decedent. *Id.* ¶ 23. Defendant argues that in calculating this ratio, the total compensatory damages award must be reduced by Decedent's comparative fault, because to do otherwise would result in punishing Defendant for *another party's* conduct. Here, the jury determined that Decedent suffered actual damages of $2,957,000, but that Defendant was only responsible for 65 percent of that harm (and that Decedent was responsible for 35 percent). Therefore, Defendant argues, the amount of compensatory damages caused by Defendant was actually $1,922,050, and it is this amount that should be compared with

the $13,000,00 in punitive damages that was awarded. This results in a ratio of punitive damages to compensatory damages of approximately 6.76 to 1 as opposed to a ratio of punitive damages to total compensatory damages of 4.4 to 1. Defendant then asserts that this ratio of 6.76 to 1 is unconstitutionally excessive. Plaintiff, on the other hand, asserts that the proper ratio to consider is the ratio of punitive damages to the harm suffered, 4.4 to 1.

{36} We do not decide which ratio is applicable and assume, for purposes of analysis, that Defendant is correct in arguing that the applicable ratio we are to consider is 6.76 to 1. *See Waddill v. Anchor Hocking, Inc.,* 190 Or.App. 172, 78 P.3d 570, 576 n. 6 (2003) (rejecting the contention that the ratio to consider is punitive damages to total damages without any deduction for the plaintiff's comparative fault). In *Campbell,* the United States Supreme Court specifically declined to impose a bright-line ratio that a punitive damages award cannot exceed. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. While stating that "[s]ingle-digit multipliers are more likely to comport with due process," *id.,* the Court also acknowledged that a single-digit multiplier does not necessarily establish an appropriate limitation on a punitive damages award in egregious cases. *Id.* In recognizing and applying these principles, our own Supreme Court has stated that the test under this prong of *BMW* is that "[t]he amount of an award of punitive damages must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice." *Chavarria,* 2006–NMSC–046, ¶ 38, 140 N.M. 478, 143 P.3d 717 (quoting *Aken,* 2002–NMSC–021, ¶ 23, 132 N.M. 401, 49 P.3d 662). In this case, the jury was instructed, consistent with UJI 13–1827 NMRA, that:

> Punitive damages are awarded for the limited purposes of punishment and to deter others from the commission of like offenses. The amount of punitive damages must be based on reason and justice taking into account all the circumstances, including the nature of the wrong and such aggravating and mitigating circumstances as may be shown. The amount awarded, if any, must be reasonably related to the injury and to any damages given as compensation and not disproportionate to the circumstances.

{37} Defendant does not argue that the jury failed to comply with this instruction, and we must presume that the jury followed it. *Vigil,* 117 N.M. at 670, 875 P.2d at 1101. Moreover, in our examination of the record, we see no evidence that the jury disregarded the instruction.

{38} Given that Defendant's conduct was on the high end of the reprehensibility scale, that Decedent suffered excruciating pain, an intangible difficult to measure, that Decedent died, and that Decedent was only nineteen years old when he died, we conclude that neither ratio, both of which are single-digit ratios (6.76 to 1 or 4.4 to 1), exceeds constitutional limits in this case. *See generally Romo v. Ford Motor Co.,* 113 Cal.App.4th 738, 6 Cal.Rptr.3d 793, 810–11 (2003) (stating that in the context of malicious conduct, because public policy and the legitimate interests of a state in the protection of its people require a mechanism to punish and deter conduct that kills people, death actions present examples of cases in which a single-digit multiplier does not form an appropriate limitation upon a punitive damage award); *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.,* 1999–NMSC–006, ¶ 49, 127 N.M. 1, 976 P.2d 1 (approving a multi-million-dollar punitive damages award with a ratio of 7.4 to 1).

{39} The final step in our analysis is a comparison of the punitive damages award with potential civil and criminal sanctions. "[T]he comparable sanctions factor is the least important indicium." *Aken,* 2002–NMSC–021, ¶ 25 132 N.M. 401, 49 P.3d 662. This guidepost has "been criticized because the [Supreme] Court did not give any guidance as to what to do if there are *not* any substantial legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (internal quotation marks and citation omitted). Here, Defendant failed to exercise ordinary care to protect its wellhead from contact with motor vehicles. Defendant argues that the relevant civil penalty is a $500 fine imposed for failure to fence a well

site in a nearby area where such fencing is regulated. "[W]hen statutory penalties for the conduct in question are low or do not exist, a consideration of the statutory penalty does little to aid in a meaningful review of the excessiveness of the punitive damages award." *Id.* (internal quotation marks and citation omitted). Therefore, we find this comparison unhelpful in determining the reasonableness of the punitive damages award in this case.

{40} We have carefully weighed the *BMW* factors to determine whether the punitive damages award in this case exceeds the outer limits of due process, and we conclude that it does not. We therefore affirm the jury's judgment that punitive damages of $13,000,000 are appropriate to achieve the dual goals of punishment and deterrence in this case.

**CONCLUSION**

{41} The final judgment is affirmed.

{42} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, and CELIA FOY CASTILLO, Judges.