This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**CORNELIUS DOOLEY M.D. AND**
**SUSAN HOFFMAN-DOOLEY,**

Plaintiffs-Appellees,

v.                                    **NO.  31, 073 Consolidated with 31,072**

**QUIET TITLE COMPANY, LLC,**
**A New Mexico Limited Liability Company,**
 **and J. MICHAEL HYATT,**
**Individually and as a member of**
**QUIET TITLE COMPANY, LLC,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Sarah M. Singleton, District Judge**

The Simons Firm LLP
Thomas A. Simons IV
Daniel H. Friedman
Kelcey Nichols
Santa Fe, NM

for Appellees

Lorenz Law
Alice Tomlinson Lorenz
Albuquerque, NM

Sommer Udall Sutin Hardwick & Hyatt, PA

Jack N. Hardwick
Kurt A. Sommer
Santa Fe, NM

for Appellants

**MEMORANDUM OPINION**

**ZAMORA, Judge.**

{1}     Quiet Title Co., LLC and J. Michael Hyatt (Defendants) appeal from a jury verdict awarding HDQ, LLC money damages after Defendants failed to close on HDQ's contract for the purchase of three condominium units and instead closed the purchase with Maxmedical.  Defendants challenge the jury instructions, HDQ's intentional interference with contract claim, admission of expert testimony, and the amount of the awards for compensatory damages and punitive damages.  We affirm.

**BACKGROUND**

{2}     The original plaintiffs in this suit were HDQ, LLC and its three physician members, Doctors Hoverson, Dooley and Quinn.  The cause of action has since been assigned to Dr. and Mrs. Dooley.  We refer to all of the above collectively as Plaintiffs for simplicity and consistency throughout the Opinion.  The parties are familiar with the facts of the case, but we briefly identify the parties and recount a time line of events to assist in our analysis below.

{3}     HDQ's members included Doctors Hoverson, Dooley and Quinn. Quiet Title, the title company and closing agent, consists of co-defendant Michael Hyatt as Manager, its sole member was Trestle Ranch Corporation, and Hyatt is owner of Trestle Ranch Corporation. Maxmedical is owned by Poohbah Corporation, and Poohbah is owned by Hyatt. Selene T. Sinclair was the Trustee of the Selene T. Sinclair Separate Property Trust.

{4}     On May 21, 2009, the Selene Sinclair Trust (Seller) contracted with Maxmedical to sell three medical office condominium units for $500,000, with a closing date of June 15, 2009, a Monday. The broker for that deal was Leon Mellow, who was to evenly split a six percent commission with Seller's real estate agent. The Doctors' Park Condominium Owners' Association (DPCOA) reserved a right of first refusal that permitted it to purchase the units on the same terms and conditions of the Maxmedical contract if that right was exercised by June 12, 2009, a Friday. The DPCOA assigned its right to Dr. Hoverson on June 9, and the next day, Dr. Hoverson, as a managing member of HDQ, signed a purchase contract with Seller. Plaintiffs' contract called for the same purchase price and closing date, but rather than allowing for a split commission listed in the Maxmedical contract, Plaintiffs' contract provided a 5.5 percent commission going solely to Seller's real estate agent.

{5}     On June 10, 2009, Defendants worked with Seller to prepare closing documents for the sale to Plaintiffs. Because Seller was leaving town that week and would be unreachable until several days after the closing date, Defendants had Seller sign closing documents for the Maxmedical purchase as well, to serve as a backup in case the sale to Plaintiffs could not be executed. The June 15 closing date was considered crucial because Seller was facing imminent foreclosure on the property. As of June 12, 2009, Defendant Hyatt did not think that HDQ had exercised the right of first refusal correctly. When Defendants reviewed Plaintiffs' contract on June 15, Defendants concluded that the non-matching commissions in the two sale contracts resulted in a defective execution of the right of first refusal because the agreement was not on the same terms and conditions as the Maxmedical contract. Defendants also cited flaws in the lending bank's security requirements and in Plaintiffs' attempt to satisfy requirements of the title binder. At no time between June 12 and June 15 did Defendants alert Plaintiffs of any shortcomings. Instead, on June 15, Defendants rejected Plaintiffs' closing bid and closed on the deal between Seller and Maxmedical, informing Plaintiffs of the sale after it was complete. Plaintiffs alleged that Defendants' actions violated a fiduciary duty, as closing agent, to disclose the information that impeded Plaintiffs' sale in favor of a closing overseen by one of Mr.

Hyatt's business entity associations (Quiet Title) for a sale to another of Mr. Hyatt's business entity associations (Maxmedical).

{6} Plaintiffs filed this action against Defendants, Maxmedical, and Seller, alleging breach of fiduciary duty, negligence, fraud, intentional interference with contract, breach of contract, and a violation of the New Mexico Unfair Practices Act. Seller was later dropped as a party, and the jury found in favor of Maxmedical on all counts against it. Against Defendants, the district court allowed three claims to go to the jury: (1) negligent failure to disclose problems with Plaintiffs' attempt to exercise its right of first refusal; (2) breach of fiduciary duty for Defendants' failure to disclose those problems; and (3) intentional interference with contract. The jury found in favor of Plaintiffs and awarded $335,107 in compensatory damages and $1.5 million in punitive damages. Defendants filed this appeal.

**DISCUSSION**

{7} Defendants raise four main issues, arguing that: (1) the jury instructions failed to explain that Plaintiffs' improperly executed right of first refusal was not an enforceable contract, as a matter of law, and consequently, Plaintiffs could not meet their burden of proof on causation; (2) expert testimony should not have been admitted; (3) evidence was insufficient to allow the jury to determine damages for lost

rental income; and (4) the punitive damages award was improper. We take those arguments in turn.[1]

## I.     Execution of the Right of First Refusal

{8}     Defendants first argue that they were denied jury instructions that would have informed the jury that Plaintiffs' contract was marred by terms that were materially different than the original Maxmedical sales contract. To properly exercise a right of first refusal, the DPCOA agreement required Plaintiffs to purchase the property according to the same material terms and conditions as the original contract. Because the court concluded that the failure to provide a commission for Mr. Mellow constituted a material difference, Defendants contend that Plaintiffs' failure to properly execute the right of first refusal meant there was no enforceable contract to purchase the property. Therefore, Defendants argue, Plaintiffs' claim fails as a matter of law because there was no valid contract with which to interfere. Finally, Defendants contend that Seller's unavailability after June 10, 2009 meant that, even if informed of any defects in the contract, Plaintiffs could not have cured those defects and thus cannot now prove a causative link between Defendants' actions and any resulting harm. We address those arguments in order.

---

[1] Defendants have elected not to pursue their appeal, in consolidated cause number 31,072, from the district court's denial of costs pursuant to their Statement filed on March 25, 2013. Only the issues from No. 31,073 remain.

6

**A.      Jury Instructions on HDQ's Proper Exercise of Right of First Refusal**

{9}      Defendants argue that the district court improperly rejected their request for jury instructions that would have told the jury that (1) a real estate broker is entitled to a commission even if the property is sold to a subsequent buyer exercising a right of first refusal and (2) Plaintiffs' failure to include a contractual provision granting a commission to Seller's original broker meant that their contract was not on the same material terms and conditions as the original sales contract.  Defendants contend that the denial of the instructions prevented them from presenting their theory of the case to the jury.

{10}      "The propriety of jury instructions given or denied is a mixed question of law and fact, and we review factual questions under a substantial evidence standard and we review the application of law to the facts de novo." *State v. Soutar*, 2012-NMCA-024, ¶ 21, 272 P.3d 154 (alterations, internal quotation marks, and citation omitted). We consider "whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Cunningham*, 2000-NMSC-009, ¶ 14, 128 N.M. 711, 998 P.2d 176 (internal quotation marks and citation omitted).

{11}      Defendants requested the following instruction:  "The [c]ourt has determined that [Plaintiffs] did not effectively exercise the right of first refusal because the [Plaintiffs'] [c]ontract was not on the same material terms and conditions as the

7

Maxmedical [c]ontract as a matter of law." The district court submitted the following instructions to the jury:

> In order for a holder of a right of first refusal to validly exercise a right of first refusal, the holder must agree to buy the property on the same material terms and conditions set forth in the first contract between the seller of the property and the original buyer. . . .

> The [c]ourt has determined that the failure of the [Plaintiffs'] [c]ontract to provide for the payment of a commission to Leon Mellow's company was a material difference between the [Plaintiffs'] [c]ontract and the Maxmedical [c]ontract as a matter of law. This determination may be considered by you in determining whether the actions of [D]efendants were justified and whether punitive damages should be awarded.

{12} "A party is entitled to have the jury instructed upon all correct legal theories of his case which are pleaded and supported by evidence, and a failure by the trial court to so instruct constitutes reversible error." *McNeill v. Burlington Res. Oil & Gas Co.*, 2008-NMSC-022, ¶ 21, 143 N.M. 740, 182 P.3d 121 (internal quotation marks and citation omitted); *see also State v. Brown*, 1996-NMSC-073, ¶ 34, 122 N.M. 724, 931 P.2d 69 ("When evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error."). However, our courts have long held that it is not error to submit to the jury an alternative instruction that "essentially states the same rule" as the instruction offered by a party. *Apodaca v. Miller*, 79 N.M. 160, 165-66, 441 P.2d 200, 205-06 (1968) (stating that "refusal to

8

give a requested instruction in the form tendered is not error where another correct instruction on the same rule of law is in fact given").

**{13}** The jury instructions submitted by the district court conveyed the same concept as did Defendants' requested instruction: in order to properly exercise the right of first refusal, Plaintiffs' contract was required to be on the same material terms and conditions of the Maxmedical contract; and the provision for Mr. Mellow's commission constituted a material term. "A jury instruction is proper, and nothing more is required, if it fairly and accurately presents the law." *Heath v. La Mariana Apartments*, 2007-NMCA-003, ¶ 22, 141 N.M. 131, 151 P.3d 903 (internal quotation marks and citation omitted); *see also Folz v. State*, 110 N.M. 457, 467-68, 797 P.2d 246, 256-57 (1990) (expecting instructions "to provide adequate guidance to the jury on the task that lay before it" and stating that "[i]nstructions will be held adequate if they fairly represent the law applicable to the issue in question"). Here, the court rejected Defendants' proposed instructions but submitted two instructions that were worded differently but that effectively addressed the issue raised. We see no evidence that the submitted instructions created confusion for the jury; instead the district court's action properly guided the jury in its task at hand.

**B.      Whether the Contract Was Enforceable and Plaintiffs Had a Viable Claim**

9

**{14}** Defendants argue that because Plaintiffs' contract failed to match the terms and conditions of the Maxmedical contract, the exercise of the right of first refusal was defective and Plaintiffs had no enforceable contract—and thus no interference claim. Defendants contend that the district court allowed "an untenable claim" to go to the jury.

**{15}** Defendants cite out-of-state authority for the proposition that a claim of interference with contract will not lie when the contract at issue is unenforceable. New Mexico case law teaches otherwise. *See Wolf v. Perry*, 65 N.M. 457, 461, 339 P.2d 679, 681 (1959), stating:

> The general rule is that one who, without justification or privilege to do so, induces a third person not to perform a contract with another, is liable to the other for the harm caused thereby. The prevailing doctrine is that liability for inducing a breach of contract attaches even if the contract, though valid, is unenforceable.

(Citation omitted).

**{16}** In *Kelly v. St. Vincent Hospital*, 102 N.M. 201, 207, 692 P.2d 1350, 1356 (Ct. App. 1984), this Court noted that the tort could be accomplished by either of two methods: improper motive solely to harm the plaintiff or improper means. If proven, either basis standing alone will support liability. *Id.* In our most recent case of *Zarr v. Washington Tru Solutions, LLC*, 2009-NMCA-050, 146 N.M. 274, 208 P.3d 919, we set out the correct standard for a finding of improper means.

> What may qualify as 'improper means' depends to some degree on context and can include, but is not limited to predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs.

*Id.* ¶ 11. We see no reason to diverge from that reasoning, and we conclude that Plaintiffs' contract with Seller provided a valid basis for a claim of intentional interference with contract.

## C. Seller's Unavailability and Connection to Proof of Causation

{17} Defendants further contend that the material difference between the contracts—the omission of a commission for the original broker, Mr. Mellow—could not have been resolved before the June 12 expiration date of the exercise of right of first refusal or the June 15 closing date because the Seller was out of town and incommunicado until at least June 17. Thus, Defendants argue, Plaintiffs introduced no evidence to show that any failure by Defendants to inform them of the discrepancy caused their damages. Plaintiffs counter by pointing out that simple notice, not a contract, was all that was needed to properly exercise the right of first refusal, and that any discrepancies between contracts could have been resolved by the June 15 closing if Plaintiffs had been informed of the problems.

11

{18}     Plaintiffs note that nothing in their contract with Seller prohibited the payment of a commission to Mr. Mellow. While the contract provided a commission only for Seller's real estate agent and stated that no other broker had a claim for a commission, the contract also included an indemnification provision to correct any misrepresentations. At trial, Plaintiffs brought forth testimony from Dr. Hoverson that "[i]f I'd have known about Mr. Mellow, maybe we could have tried to come to some accommodation, but I didn't know about him." And Mr. Hyatt acknowledged that Plaintiffs likely had the ability to provide sufficient personal funds to finance the entire transaction, including Mr. Mellow's additional commission, if necessary. Evidence thus was presented that Seller's presence was not necessarily required to have resolved any discrepancies over the payment of a commission.

{19}     Regardless of whether Plaintiffs could have cured any defects before closing without the availability of Seller, the key issue at trial was the undisputed fact that Defendants never informed Plaintiffs about the discrepancy in commissions or any other problems with the closing of Plaintiffs' contract. Seller's unavailability during the final days leading up to the closing date of June 15 did not constitute a per se bar to Plaintiffs proving a causative link between Defendants' actions and Plaintiffs' damages.

## II.     Admissibility of Expert Testimony

{20} Defendants next assert that the testimony of Plaintiffs' expert, Leonard Espinosa (Expert), was improper and inadmissible because it misled the jury about the elements of duty and breach, in particular the duties required of a title agency during the closing process. Defendants contend that Expert made incorrect assumptions about what Defendants knew the week before the closing date and also impermissibly offered his own conclusions of law.

{21} We review a district court's admission of expert testimony for an abuse of discretion. *State v. Torrez*, 2009-NMSC-029, ¶ 9, 146 N.M. 331, 210 P.3d 228. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. When reasons both supporting and detracting from a decision exist, there is no abuse of discretion. *Talley v. Talley*, 115 N.M. 89, 92, 847 P.2d 323, 326 (Ct. App. 1993).

{22} We look to the admissibility of Expert's testimony. We note that Expert's recitation of the duties of a title company and escrow agent were actually endorsed by Mr. Hyatt, who testified during this exchange:

> Q: You heard [Expert's] testimony about the responsibilities a title company like Quiet Title owes to a buyer and a seller in a one-buyer, one-seller situation. Do you have any disagreement with anything he said about that?
>
> A: I do not.

And during this exchange:

> Q: [W]e heard a lot of testimony from [Expert] about what a title company does. Do you disagree with [Expert's] description about what a title company does?
>
> A: No, it was very good. That portion of his testimony, I thought made a lot of sense and was clear.

We see no basis for the argument that Expert misled the jury on the duties of a title company and escrow agent.

{23} We also find unconvincing Defendants' contention that Expert's opinions should have been barred because the opinions were based on the assumption that Defendants knew of the key flaw in Plaintiffs' contract as early as June 11, before the deadlines for both the exercise of the right of first refusal and the closing. Expert's testimony was elicited by Defendants during cross-examination when responding to a hypothetical from Defendants' counsel. Defendants sought neither to object to the testimony nor strike it and thus failed to preserve the argument on appeal. *See Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct. App. 1987) ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.").

{24} As to Expert's testimony stating that Defendants' failure to close Plaintiffs' contract was "egregiously" wrongful or that the standard of care for escrow agents was "very high," such testimony was rebuttable through cross-examination or through

14

Defendants' own witnesses. And our analysis above in Section I refutes Defendants' contention that Expert committed an error of law by not understanding that the omission of Mr. Mellow's commission rendered Plaintiffs' attempted exercise of the right of first refusal defective.

{25} We conclude that the district court did not abuse its discretion when it admitted Expert's testimony.

### III. Whether Evidence Was Sufficient on Lost Rental Income to Support the Award of Compensatory Damages

{26} Defendants also argue that the evidence was incomplete and insufficient to allow the jury to make a reasonable calculation as to Plaintiffs' lost rental income, which Defendants characterize as speculative. The district court considered the question a matter not of admissibility but of credibility, suitable for a jury determination. The district court ruled that "[l]oss of rental income being too speculative . . . goes to weight [of the evidence]. There's not a requirement that it be so certain that this type of evidence would not be sufficient to send it to the [j]ury."

{27} As a threshold matter, we note that the jury issued a general verdict and awarded compensatory damages in a lump sum without itemizing the damages by category. "A general verdict may be affirmed under any theory supported by evidence unless an erroneous jury instruction was given." *Bustos v. Hyundai Motor Co.*,

15

2010-NMCA-090, ¶ 48, 149 N.M. 1, 243 P.3d 440.  The jury was given the following instruction:

> In determining damages, you may award the following damages to [Plaintiffs]:
>
> 1.  The difference between the sale price of the Condominium Units in this case to [Plaintiffs] and the market value of those units as of June 15, 2009.
>
> 2.  The loss of net rental income from the rental of the units from June 15, 2009 to the date of trial.
>
> 3.  The rent [Plaintiffs] paid to Dr. Hoverson by [Plaintiffs] to rent Unit 12 pending the disposition of the property at issue in this litigation.

Plaintiffs had requested $685,107 in damages—$600,000 being the difference between the sale price and the market value of the property, $70,607 in lost rental income, and $14,500 in placeholder rent paid to Dr. Hoverson for one of his condominium units.  The jury awarded $335,107 in compensatory damages—less than half of what was requested—without breaking down the damages according to the three categories of damages allowed.  No special interrogatories were submitted to the jury requiring jurors to itemize the damages according to the difference between sale price and market value, lost future rental income, or placeholder rent paid to Dr. Hoverson.  Therefore, there is no way to know whether the jury even awarded damages to Plaintiffs based on lost rental income.  *See Littell v. Allstate Ins. Co.*, 2008-NMCA-012, ¶ 55, 143 N.M. 506, 177 P.3d 1080 (noting the multiple sources

16

of potential damages that formed the basis of a general verdict and stating that "[the defendant] may be wrong about the amount the jury attributed to [the p]laintiff's economic damages").

**{28}** To warrant reversal, an error must be prejudicial. *State v. Ranne*, 80 N.M. 188, 189, 453 P.2d 209, 210 (Ct. App. 1969). Here, Defendants cannot show that they have been prejudiced by the compensatory damages award on the issue of lost rental income. *Cf. First Nat'l Bank in Albuquerque v. Sanchez*, 112 N.M. 317, 322, 815 P.2d 613, 618 (1991) (stating that "when a jury returns a general verdict in a case submitted on alternate theories of liability, an appellate court has no way of knowing whether the jury relied upon the invalid basis in making its decision" and questioning "whether there was prejudice . . . that would justify reversal" on the issue).

**{29}** However, even if Defendants could show prejudice, we would uphold the damages award if it were supported by substantial evidence. *See Littell*, 2008-NMCA-012, ¶ 54 (stating that "[the defendant's] argument is partly that there was insufficient evidence supporting the damages award, and to that extent we employ the substantial evidence standard of review"). "Once damage is established, appellate courts will be reluctant to reverse an award on the ground that the amount is too speculative." *Naranjo v. Paull*, 111 N.M. 165, 172, 803 P.2d 254, 261 (Ct. App. 1990).

{30}     In the case before us, testimony from Dr. Hoverson put forth evidence that Plaintiffs planned to lease the three purchased condominium units to their own endoscopy center, which was forty-nine percent owned by the doctors and fifty-one percent owned by AmSurg, a national company that operates endoscopy centers. Dr. Hoverson testified that an architect for AmSurg prepared preliminary drawings for the space in question, a contractor had toured the site to prepare cost estimates for renovation, and Plaintiffs had worked with AmSurg in building two such endoscopy centers in the past. He explained the calculations involved in arriving at the market rate and monthly rent payments that would have resulted from the purchase of the units. Dr. Hoverson concluded:

> So we have a good track record with [AmSurg]. And I think that we know pretty much how they do things. So I think [the expectation of rental income is] more than pure speculation; I think it's based on past experience, and I think that has a pretty good predictive value going forward.

Dr. Hoverson testified that AmSurg's goal is "to keep us happy." He testified that AmSurg was willing to negotiate a move to the new location and was willing to pay for the cost of renovation and make rent payments, at market rates, during construction.

**{31}** The district court ruled that Defendants' objections to that testimony went to the weight of the evidence, not its admissibility. We agree. The testimony was subject to cross-examination.

**{32}** When reviewing a damages award, "there must be some evidence which directly gives the jury a means by which to measure damages[.]" *Curtis v. Schwartzman Packing Co.*, 61 N.M. 305, 312, 299 P.2d 776, 781 (1956). And while certainty as to the cause of damages is required, uncertainty as to the exact amount is permissible. *Jackson v. Goad*, 73 N.M. 19, 23, 385 P.2d 279, 281-82 (1963) ("Proof of the cause of the damages being thus certain, mere uncertainty as to the actual amount will not preclude recovery."). We accept damage estimates if they are capable of "reasonable ascertainment." *Rudolph v. Guy*, 61 N.M. 284, 286, 299 P.2d 462, 463 (1956) ("Uncertainty as to the amount of damages does not preclude recovery.").

**{33}** When courts find a calculation of damages too remote or speculative, evidence is lacking. In *Price v. Van Lint*, 46 N.M. 58, 69-70, 120 P.2d 611, 618 (1941), our Supreme Court rejected a request for lost profits because of a lack of testimony and because the business in question was new and unproven. Nevertheless, the Court did allow damages for loss of rental income. *Id.* In *Mascarenas v. Jaramillo*, 111 N.M. 410, 415, 806 P.2d 59, 64 (1991), a request for damages based on lost rental income was rejected because no prospective tenants testified or were identified, and the owner

of the property presented no evidence of the market rate for the rental property in question. By contrast, in the case before us, Plaintiffs presented evidence of a prospective tenant, as well as architecture and business preparations for the potential lease arrangements, and the going rate for such a leased space. We conclude that substantial evidence existed for the jury to award damages to Plaintiffs for lost rental income.

**IV.     Punitive Damages Award**

{34}     Defendants first argue that the punitive damages award was the result of passion, prejudice, improper considerations, and mistake on the part of the jury. They also contend that the size of the punitive damages award is constitutionally improper. [**BIC 43-44**] We take those arguments in order.

**A.      Whether the Punitive Damages Award Was the Result of Jury Passion, Prejudice, Improper Considerations, or Mistake**

{35}     "Punitive damages punish the wrongdoer and serve as a deterrent; the award does not measure a loss suffered by the plaintiff." *Madrid v. Marquez*, 2001-NMCA-087, ¶ 4, 131 N.M. 132, 33 P.3d 683. We examine the findings underlying a jury's award of punitive damages to determine whether the findings are supported by substantial evidence. *Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*,

20

2001-NMCA-082, ¶ 36, 131 N.M. 100, 33 P.3d 651. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* "We resolve all disputed facts in favor of the jury's findings and indulge all reasonable inference[s] in favor of the verdict, while disregarding all inferences to the contrary." *Helena Chem. Co. v. Uribe*, 2013-NMCA-017, ¶ 35, 293 P.3d 888, *rev'd on other grounds by* 2012-NMSC-021, 281 P.3d 237.

{36} In the case before us, the jury was permitted to award punitive damages if it found that Defendants' actions were "malicious, willful, reckless, wanton[,] or in bad faith." The jury awarded $1.5 million in punitive damages. "The proper approach is to examine [the p]laintiff's evidence related to damages and determine whether that evidence could justify the amount of the verdict, or determine whether the verdict amount was grossly out of proportion to the evidence[.]" *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 22, 146 N.M. 853, 215 P.3d 791. We then "determine whether the disproportionality shocks our conscience." *Id.* "We will not reweigh the evidence and substitute our judgment for that of the jury." *Littell*, 2008-NMCA-012, ¶ 58.

{37} Defendants make several arguments that we have already disposed of above. They argue that Expert made misstatements about duty and criticized Defendants' handling of Plaintiffs' contract, thus giving the jury the mistaken impression that

21

Defendants deserved to be punished. Defendants also repeat the contention that they "were right about the defectiveness of [Plaintiffs'] attempted exercise" of the right of first refusal. Both of those arguments are misplaced.

{38} As evidence that the jury was inflamed by passion, prejudice, or misunderstanding, Defendants also contend that the transaction itself was complex, that Defendants have a good reputation in the community, and that there was no evidence of continued or repeated misconduct. While those factors may weigh in Defendants' favor, other evidence of wrongdoing and self-dealing was presented, such as Defendant Hyatt's interest in Maxmedical, which was in a position to purchase the condominium units if HDQ did not properly exercise the right of first refusal; Defendant Hyatt's interest in Quiet Title, the title company and closing agent that would make the determination of whether or not the right of first refusal had been properly exercised; and Defendant Hyatt's extensive conversation with an attorney about the requirements of the right of first refusal, and we refuse to reweigh the evidence on appeal. *See Gonzales v. Lopez*, 2002-NMCA-086, ¶ 26, 132 N.M. 558, 52 P.3d 418. Indulging all inferences in favor of the jury's verdict, we cannot say that the award of punitive damages was unrelated to the injury suffered by Plaintiffs. *See Green Tree Acceptance, Inc. v. Layton*, 108 N.M. 171, 174, 769 P.2d 84, 87 (1989) ("Punitive damages do not have to be in reasonable proportion to the actual damages,

22

but they must not be so unrelated to the injury as to plainly manifest passion and prejudice rather than reason and justice."). Nor does the punitive damages award shock the conscience of the court.

{39} We conclude that Defendants have failed to show that the jury verdict was a result of passion, prejudice, improper considerations, or mistake.

**B. Whether the Punitive Damages Award Was Constitutional**

{40} When reviewing the constitutionality of an award of punitive damages, we apply de novo review, making an independent assessment of the record in order to determine whether the jury's award of punitive damages is comparatively reasonable. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶ 19, 132 N.M. 401, 49 P.3d 662. When reviewing an award of punitive damages for reasonableness, we are guided by three criteria: "(1) the reprehensibility of the defendant's conduct, or the enormity and nature of the wrong; (2) the relationship between the harm suffered and the punitive damages award; and (3) the difference between the punitive damages award and the civil and criminal penalties authorized or imposed in comparable cases." *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 36, 140 N.M. 478, 143 P.3d 717. The third factor has been marginalized as "ineffective and very difficult to employ." *Aken*, 2002-NMSC-021, ¶ 25. We analyze the first two criteria.

23

{41}     As to the first factor, "the degree of reprehensibility of a defendant's conduct is the most important indicium of the reasonableness of a punitive damages award." *Jolley v. Energen Res. Corp.*, 2008-NMCA-164, ¶ 32, 145 N.M. 350, 198 P.3d 376 (alterations in original) (internal quotation marks and citation omitted).  In evaluating the degree of reprehensibility, we examine whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* "The inquiry is concerned with the social odium which should be attached to the defendant's conduct.  The applicability of the factors is obviously fact and case dependent." *Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 50, 150 N.M. 283, 258 P.3d 1075.

{42}     We have previously found a punitive damages award appropriate when the defendant acted with "intentional malice" in depriving another realtor of its commission. *Bogle v. Summit Inv. Co.*, 2005-NMCA-024, ¶ 34, 137 N.M. 80, 107 P.3d 520.  In the case before us, evidence presented was related to Defendants' failure to be forthright in the form of self-dealing while holding a fiduciary duty to Plaintiffs; the jury could have found that behavior to be reprehensible.  In addition, punitive

damages here would also serve the purposes of both punishing the conduct at issue and deterring similar future wrongdoing. *Id.*

{43} The second factor considers the Plaintiffs' injury and assesses the relationship between the harm suffered and the size of the punitive damages, often translated into a general ratio without drawing a firm mathematical line. *See Aken*, 2002-NMSC-021, ¶ 23; *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 49, 127 N.M. 1, 976 P.2d 1. A ratio of up to 10-to-1 between punitive damages and compensatory damages has been considered acceptable under New Mexico case law. *Aken*, 2002-NMSC-021, ¶ 24. In *Allsup's*, our Supreme Court allowed to stand punitive damages that represented a 7.4-to-1 ratio over compensatory damages, "which easily bears constitutional scrutiny[.]" 1999-NMSC-006, ¶ 49. In the case before us, the ratio between punitive damages and compensatory damages is approximately 4.5-to-1, which falls within an acceptable range under constitutional analysis.

{44} We conclude that the punitive damages award in this case was not impermissibly onerous or otherwise constitutionally unsound.

**CONCLUSION**

{45} For the foregoing reasons, we affirm the ruling of the district court.

{46} **IT IS SO ORDERED.**

_____
**M. MONICA ZAMORA, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**CYNTHIA A. FRY, Judge**